[Civ. No. 2644. Third Appellate District.—December 29, 1923.]

## M. J. KINNEBERG, Respondent, v. FIREMEN'S INSURANCE COMPANY (a Corporation), Appellant.

[1] FIRE INSURANCE — AUTOMOBILE POLICY — TITLE — EVIDENCE — FINDINGS.—In this action upon an automobile fire insurance policy which contained a provision voiding the policy if "the interest of the assured in the property be other than unconditional and sole ownership, or if the subject of this insurance be or become encumbered by any lien or mortgage," the trial court was justified in finding from the evidence that a certain document purporting to transfer the car from plaintiff to a third party as security for money owed the latter, although signed by both, was never delivered by plaintiff or accepted by said third party, and that said document did not pass title to the automobile to said third party, or create a lien thereon in his favor.

APPEAL from a judgment of the Superior Court of Sacramento County. Charles O. Busick, Judge. Affirmed.

---

Insurance against damage to automobile by fire, notes, Ann. Cas. 1915A, 627; Ann. Cas. 1917D, 53; 14 A. L. R. 199.

The facts are stated in the opinion of the court.

Goodfellow, Eells, Moore & Orrick for Appellant.

William V. Cowan and J. M. Inman for Respondent.

PLUMMER, J.—This is an action by plaintiff to recover the sum of $1,600 on an automobile fire insurance policy. Plaintiff had judgment and the defendant appeals.

[1] The only question presented for consideration upon this appeal is whether the plaintiff had an insurable interest in the automobile covered by the policy issued by the defendant at the time of its destruction by fire. It appears that some time prior to the fire and after the issuance of the policy sued upon in this action the plaintiff borrowed from one Thomas Byrne the sum of $1,266 and gave his promissory note therefor.

The policy in question contains the following provisions:

"If the interest of the assured in the property be other than unconditional and sole ownership, or if the subject of this insurance be or become encumbered by any lien or mortgage except as stated in warranty No. 3 or otherwise endorsed hereon."

Warranty No. 3 is as follows:

"The automobile described is fully paid for by the assured and is not mortgaged or otherwise encumbered."

A few days after the execution of the note above referred to Thomas Byrne called at the place of business of the plaintiff Kinneberg, not, however, in connection with the loan herein referred to or for the purpose of obtaining any security therefor. However, at the time of said call the plaintiff Kinneberg went into his office and wrote out the following document:

"Superior Motor Sales Co.
"1910 M Street. Phone Main ——.
"Sacramento, Cal. Aug. 1, 1921.
"Sold to—T. Byrne, Sacramento, Calif.
"1 Pan-American Touring Car #3176.
"1266.00.
"Received payment.
                    "(Signed)    M. J. KINNEBERG.

"The above car is given as security on a $1266.00 note, in favor of T. Byrne, and said car is to remain the property of said T. Byrne until said promissory note is paid, together with interest thereon as specified in said note.

"Signed: M. J. KINNEBERG.
"Signed: THOS. BYRNE."

This paper was made out in duplicate, plaintiff signed both copies and handed them to Byrne. Byrne at first declined to sign the paper, stating that he did not care for the instrument, but upon further request by the plaintiff Byrne signed both copies and handed them back to plaintiff, stating that he did not want the same. The circumstances of what took place in this transaction are shown by the testimony set out in the transcript, which is as follows:

"Q. Mr. Kinneberg, didn't you at the time you borrowed the money from Mr. Byrne execute a bill of sale in the form of a promissory note covering this, in—a promissory note in the form of a mortgage on this car? A. All I gave him was a note for the money. That is all he asked. Q. You never signed any bill of sale of any kind? A. I made out a bill of sale subsequently to that, and offered it to him, but it was never accepted, because he didn't want it. Q. Mr. Kinneberg, you signed a bill of sale, didn't you? A. Yes, sir. Q. And Mr. Byrne signed it? A. Yes, sir. Q. You signed two copies, didn't you? A. Yes, sir. Q. And you kept one and he kept the other? A. No, sir, he did not. Q. Who kept the original copy? A. I kept it, and it was destroyed simply because he didn't want it. Q. Well, why did Mr. Byrne sign it? A. He signed it before he realized what he was signing. He came down to my place to tell me that he had two or three people that he though he could sell that car to, and I merely offered this to him and he signed it, and after we got through, he said, 'What is this?' And I said, 'Well, it is simply a bill of sale, and I feel that you are entitled to it as additional security'; and he said, 'I don't want it,' and he left it on my desk, and after he went away I destroyed it. Q. You didn't destroy this one, did you? A. No, it was simply left there and mixed up with the rest of my papers when I delivered them to Mr. Cowan. Q. He signed both of them, didn't he—Mr. Byrne? A. He did, yes, sir. . . . Q. This was a week after you loaned him the money

you went down there to borrow a car? A. Yes, sir. Q. And did this question of a bill of sale come up? A. He asked me to sign it. Q. Did he have it prepared? A. No, he did not. Q. Who prepared it? A. He did. Q. While you were down there? A. Yes. Q. Now state what he said. A. Well, I don't know. The only thing is, he just told me to sign it, and it would make it solider for me, security for me, that is all. Q. Well, was this before he made it out? A. Before he made what out? Q. The bill of sale. A. No, it was afterwards. Q. After he made it out? A. Yes. Q. Well, when you got down there the bill of sale wasn't made out? A. No. Q. Did he sit down and make it out in front of you? A. Yes. Q. What did he say when he was making it out? A. Didn't say anything until he got it made out. Q. You didn't know what he was doing? A. No. Q. After he got it made out, he turned to you and said: 'Sign this'? A. No; he told me to sign that and it would make it more secure for me, and then I read it and handed it back to him and told him I didn't want it. Q. Why didn't you want that? A. Why, because it is no good. Q. Why do you say that, 'No good'? A. That is no bill of sale. Q. Well, you objected to signing it because you didn't like the form of it; is that it? A. No, because I didn't want to take it because I didn't believe it was any bill of sale. Q. Well, why did you sign it? A. I signed it because he asked me to. Q. Well, why didn't you take it? A. Well, because I didn't want it. Q. But you signed it? A. Yes, and left it there, because I didn't want it. . . . Q. He didn't say anything about it until he went to give it to you? A. No; he just told me to sign it; it would make the note more secure for me. Q. And you said no? A. Yes, sir. Q. Then what happened? A. That is all. I signed it, and told him to keep it, I didn't want it. Q. You told him to keep it; you didn't want it? A. Yes, sir. Q. And he kept it? A. Yes, sir. Q. The two copies? A. Yes, he kept them. Q. He offered you one copy, though, did he? A. He offered it to me, and I didn't want it. Q. You just said, 'You keep it'? A. Yes. Q. Is that all you said? A. That is all I told him. I says: 'I don't want it; you can keep it.' . . . A. No, I just signed it for him. He asked me to sign it. He told me it would make it safer for me. Q. Did you

or did you not at that time ask Mr. Kinneberg to take care of it as your agent. A. I told him he could keep it and take care of it.''

The witness Byrne also stated that he did not consider the paper any good as a bill of sale and did not want it. The foregoing testimony was repeated several times as appears by the transcript but the substance and effect thereof remained unchanged by the repetitions.

The trial court found that the interest of the insured in the automobile in question was unconditional and sole ownership at the time of its destruction by fire on the twenty-first day of November, 1921; that the policy was in full force and effect; and as a conclusion of law from the facts found that the plaintiff was entitled to judgment for the insurance and entered judgment accordingly.

The writing referred to as a bill of sale was excluded from the testimony and therefore from consideration by the trial court on the ground that it was never delivered; and that no title to the automobile ever passed from Kinneberg to Byrne; and that no lien upon the automobile was created by the transaction just referred to.

The testimony shows that the plaintiff handed the paper to Byrne with the request that he sign the same and that after the two copies were signed they were handed back by Byrne to the plaintiff. No further or other attempted delivery was made by Kinneberg and the papers thereafter remained in his sole custody and control; that in the beginning of the transaction the plaintiff intended by the writing referred to, to give Byrne security for the money theretofore borrowed from him seems clear. It is also evident that Byrne did not want any security in addition to the promissory note then held by him evidencing the amount of the indebtedness owed by the plaintiff. The evidence shows that one copy of the paper in question was destroyed and the other remained in existence with the papers belonging to the plaintiff.

Under the circumstances which we have set forth and the testimony which we have copied, the question of delivery in this case is a pure question of intent to be found by the trial court. While a number of cases might be cited, the following excerpt from *Hibbard* v. *Smith*, 67 Cal.

547 [56 Am. Rep. 726, 4 Pac. 473, 8 Pac. 46], covers the question fully.

"The act solemn and authentic, done in writing in form apt for the conveyance of land, with signature and seal, does not take effect as a deed until delivery with intent that it shall so operate. The elements going to make up such a paper all constitute an act *factum* or deed, but not complete until the paper has been delivered with the intent above mentioned. The intent with which it is delivered is all important. This restricts or enlarges the effect of the instrument. It may be delivered to another person as a mere custodian, or to such person to be kept by him and delivered to a third person on a condition performed, or the happening of a certain event, or it may be delivered that it may have full operation as the deed of the party delivering it. This may be done in various modes. It is impossible to state *a priori* in exact terms what shall or shall not constitute a delivery, that the paper may have its full operation as a deed. It is to a great extent a matter of fact depending upon intent, and under such circumstances the intent as evidencing what the maker of the instrument meant to do, must be found from the circumstances of the transaction, the *res gestae,* and while some general rules may be and are laid down in regard to it to ascertain such intent, the intent must be found as a fact, and cannot always be determined as matter of law. There are some cases in which the intent is so plainly indicated by the *res gestae* that but one conclusion can be deduced. Take the case of the delivery of such an instrument to a third person as a mere custodian for the party giving it, its solution is plain that there is no delivery of the paper to make it operative as a deed. Take another case of such a paper handed by the grantor to the grantee, with the declaration this is my act and deed, a delivery would be so plainly intended that no other conclusion could be reached. A third case of the delivery of such an instrument by the maker to a third person with directions to keep it and hand it to a person named as grantee in it, on the payment by him of a sum of money, the payment of the sum of money, and the tradition of the paper as directed having been made, no other result could be reached than that the paper became by

such delivery an operative conveyance. These cases are simple, but in other cases where the intent is to be inferred from circumstances in their very nature equivocal, the solution as to delivery or not becomes one of difficulty, and depends so much on the subjective state of the mind of person or persons trying the issue produced by the evidence of the attending circumstances, that the law can lay down no certain rule on the subject. It then becomes a question of fact, and if there is evidence tending to sustain the finding of the court *a qua,* this court will not disturb it.

"This is settled, that delivery is not complete until the person delivering (grantor) has so dealt with the instrument delivered as to lose all control over it. And whether he has so dealt with the instrument depends upon the intent to be deduced from all the surrounding circumstances, the *res gestae.*"

As we read the testimony we conclude that the trial court was justified in finding that there was no time when the plaintiff had lost control of the writing called the bill of sale or when it was legally beyond his power to make any disposition thereof that he saw fit; and also that the trial court was justified in concluding that Thomas Byrne had never accepted or received the same or so acted in relation thereto, that title to the automobile destroyed by fire had passed to him, and also that no lien thereon had been created by the transactions referred to in this opinion. We conclude that the judgment of the trial court should be affirmed, and it is so ordered.

Hart, J., and Finch, P. J., concurred.

'A' petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 25, 1924.